IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

LAURA SINGLETON,                        :
                                        :
            Plaintiff,                  :
                                        :
    v.                                  : Civil Action No. 06-716-JJF
                                        :
MICHAEL J. ASTRUE,                      :
Commissioner of Social                  :
Security,                               :
                                        :
            Defendant.                  :
                                        :
                                        :


Stephen A. Hampton, Esquire of GRADY & WHITE, Dover, Delaware.
Attorney for Plaintiff.

Colm F. Connolly, Esquire, United States Attorney, OFFICE OF THE
UNITED STATES ATTORNEY, Wilmington, Delaware.
Joyce M.J. Gordon, Esquire, Special Assistant United States
Attorney, of the OFFICE OF THE GENERAL COUNSEL, SOCIAL SECURITY
ADMINISTRATION, Philadelphia, Pennsylvania.
Of Counsel: Michael McGaughran, Esquire, Regional Chief Counsel,
and Kelly C. Connelly, Esquire, Assistant Regional Counsel of the
SOCIAL SECURITY ADMINISTRATION, Philadelphia, Pennsylvania.
Attorneys for Defendant.

**MEMORANDUM OPINION**

March 31, 2008
Wilmington, Delaware

Joseph J Farnan Jr.

**Farnan, District Judge.**

Presently before the Court is an appeal pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) filed by Plaintiff, Laura Singleton, seeking review of the final administrative decision of the Commissioner of the Social Security Administration denying her application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Title II and Title XVI of the Social Security Act (the "Act"), respectively. 42 U.S.C. §§ 401-433; 1381-1383f. Plaintiff has filed a Motion For Summary Judgment (D.I. 18) requesting the Court to enter judgment in her favor. In response to Plaintiff's Motion, Defendant has filed a Cross-Motion For Summary Judgment (D.I. 22) requesting the Court to affirm the Commissioner's decision. For the reasons set forth below, Defendant's Motion For Summary Judgment will be granted, and Plaintiff's Motion For Summary Judgment will be denied. The decision of the Commissioner dated June 7, 2006, will be affirmed.

## BACKGROUND

### I.   Procedural Background

Plaintiff protectively filed an application for DIB and SSI on October 13, 2003, alleging a disability onset date of either April 1, 1994 or May 1, 2003, due to bipolar disorder and a neurological leg impairment. (Tr. 91-93, 109-110, 434-427). Plaintiff later alleged that she also suffered from disabling

1

migraine headaches. (Tr. 140). Plaintiff's application was denied initially and upon reconsideration. (Tr. 39-40, 432-433). Thereafter, Plaintiff requested a hearing before an administrative law judge (the "A.L.J."). In a decision dated April 5, 2005, the A.L.J. concluded that Plaintiff was not disabled because she could perform her past relevant work. (Tr. 41-50). Following the unfavorable decision, Plaintiff filed a timely Request For Review Of Hearing Decision/Order. (Tr. 63-65). The Appeals Council remanded the matter so that the A.L.J. could obtain additional medical records. (Tr. 83-85).

A second hearing was held on March 1, 2006. The A.L.J. again denied Plaintiff's applications concluding that she was not disabled because she could perform her past relevant work as a residential manager, salesperson, data entry clerk, security guard or cashier. (Tr. 25-34). Plaintiff timely filed another Request For Review Of Hearing Decision/Order (Tr. 21-22), and submitted additional evidence to the Appeals Council. On November 3, 2006, the Appeals Council denied Plaintiff's request for review (Tr. 14-16), and the A.L.J.'s second decision became the final decision of the Commissioner. 20 C.F.R. §§ 404.955, 416.1455; Sims v. Apfel, 530 U.S. 103, 107 (2000).

After completing the process of administrative review, Plaintiff filed the instant civil action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking review of the A.L.J.'s decision

denying her claims for DIB and SSI.  In response to the
Complaint, Defendant filed an Answer (D.I. 12) and the
Transcripts (D.I. 14, 17) of the proceedings at the
administrative level.

Thereafter, Plaintiff filed a Motion For Summary Judgment
and Opening Brief in support of the Motion.  In response,
Defendant filed a Cross-Motion For Summary Judgment and a
combined opening brief in support of his Cross-Motion and
opposition to Plaintiff's Motion requesting the Court to affirm
the A.L.J.'s decision.  Plaintiff also filed a Reply Brief.
Accordingly, this matter is fully briefed and ripe for the
Court's review.

## II.  Factual Background

### A.  Plaintiff's Medical History, Condition and Treatment

At the time of the A.L.J.'s second decision, Plaintiff was
thirty-seven years old.  She has a high school education and past
relevant work as a resident supervisor, sales clerk, data entry
clerk, security guard, inventory clerk and cashier.

1.  Mental Impairments

Plaintiff treated with Beth McKee, L.C.S.W., beginning in
1998; however, her treatment notes in the record are dated
January 26, 1999 through October 23, 2001.  Plaintiff then
discontinued treatment with Ms. McKee for a period of two years,
and resumed seeing her in October 2003.  At that time, Ms. McKee

3

found Plaintiff to be friendly and spontaneous with intact

attention, adequate concentration and intact memory. Plaintiff's

counseling focused on issues related to the custody of her

daughters and her significant other's depression. (Tr. 216-218).

Ms. McKee completed a medical statement dated May 4, 2005, in

which she noted that Plaintiff suffered from periods of anxiety,

chronic sadness and physical limitations. She noted that

Plaintiff regularly complained of "migraine headaches, lower back

and leg pain, weakness, depression, sleep difficulties (even with

medication) and poor appetite." Ms. McKee wrote:

> [Plaintiff] has enjoyed a limited amount of success in
> her current part-time job, due at least in part, to the
> fact that the mission that she accomplishes has a good
> fit with her personal creed of assisting the less
> fortunate. In spite of this exceptional
> job/personality fit, she suffers from a significant
> period of let down after each period of work. An
> expanded schedule in her current activity, or worse, a
> new activity where greater demands of precision and
> concentration are required (i.e. her former job as a
> data entry clerk) would place unbearable strain on her
> physical (leg and back pain, migraines, weakness) and
> mental (insomnia, concentration, depression, anxiety)
> capacity to function on a daily basis. Attempting to
> retrain her in a new job activity would likely result
> in a meltdown from which she would not recover.

(Tr. 359).

Plaintiff also treated with Gregory Villabona, M.D. The

earliest treatment records from Dr. Villabona are dated October

22, 2002. At that time, Plaintiff was not taking her medication

and her symptoms of anxiety, irritability and fear of the future

were reappearing. (Tr. 380). As of November 3, 2002, Plaintiff

4

had not refilled her prescription for Prempro and was "doing somewhat worse" in that regard. (Tr. 379). However, Dr. Villabona noted that Plaintiff was functional on her current medication regimen. (Tr. 379). In January 2003, Dr. Villabona noted that Plaintiff was sleeping poorly, and he diagnosed her with mild depression. (Tr. 378). In March 2003, Dr. Villabona noted that Plaintiff had experienced high stress, but she "continues to cope," and her condition was listed as stable. (Tr. 377). Treatment notes from April through July 2003 indicate that Plaintiff's depression was "situational." (Tr. 374-376). She was helped by Celexa but "only [a] partial response," and she had a "reasonable response to Lexapro, but was under additional stressors so that she was feeling overwhelmed at work and at home." (Tr. 374).

Through 2004 and into early 2005, Dr. Villabona's notes indicate that Plaintiff's condition was relatively stable with some drop in mood and difficulty handling small issues. At one visit, Plaintiff disclosed suicidal ideation, but had no plan or intent. Plaintiff remained functional at her job. (Tr. 368-372).

By March of 2005 through August of 2005, Dr. Villabona noted that Plaintiff was doing poorly on an emotional level, was unable to adequately handle her "present load," and that her relationships were deteriorating. Dr. Villabona stated that

5

Plaintiff's prognosis "does not look positive especially as the length of time of impairment." (Tr. 367-368).

Dr. Villabona completed two medical statements for Plaintiff and a letter concerning her condition. In his statement dated February 15, 2005, Dr. Villabona concluded that Plaintiff suffers from major depression recurrent, anxiety disorder, bilateral lower extremity weakness, migraines, insomnia and a tumor on her eight cranial nerve. He noted that she is totally non-functional at times and that he had "some doubts that her condition will remain stable at the present level." (Tr. 323-324). In his April 26, 2005 updated medical statement, Dr. Villabona noted that Plaintiff suffered from incidents of severe anxiety, chronic dysphoria, chronic insomnia and poor concentration and focus. Dr. Villabona noted that Plaintiff complains of poor balance, migraine headaches, lethargy, periods of falling for no reason and noticeably poor memory. Dr. Villabona opined that without medication, plaintiff would be non-functional. He further noted that in her present employment of 20 hours per week, she was able to perform well because she was familiar with her job. He opined that this job represented her "maximum functionality" and that "[r]etraining would be very difficult if doable." (Tr. 333-334). By letter dated February 28, 2006, Dr. Villabona diagnosed Plaintiff with (1) major depression and recurrent anxiety, (2) acoustic schwannoma, and (3) migraine headaches. He noted that

6

Plaintiff suffers from symptoms of anxiety and depression daily and that treatment is "helpful but remission is partial only." (Tr. 402). He opined that Plaintiff would be unable to function in the workplace at times or perform the activities of daily living, and therefore, full-time employment would not be presently possible. (Tr. 402).

In February 2004, Plaintiff underwent a consultative psychological evaluation with Joseph Keyes, Ph.D. (Tr. 227-229). Dr. Keyes noted that Plaintiff had average immediate and working memory and adequate attention and concentration. Plaintiff's orientation was average and normal, and her social and interpersonal skills were intact. Dr. Keyes noted that Plaintiff was mildly socially withdrawn with a mildly flat affect. He noted that she feels sad, worries about the future, has a poor self image and a loss of energy. She reported that she was able to perform routine household and domestic chores, could care for herself, and enjoys reading, doing crafts and watching television. Dr. Keyes concluded that Plaintiff suffered from dysthmic disorder. (Tr. 229).

In November 2005, Plaintiff underwent a second consultative psychological evaluation with Kate McGraw, Ph.D. (Tr. 394-399). Dr. McGraw noted that Plaintiff's thought process was logical, her judgment and insight were fair and her attention and concentration were intact. Plaintiff denied current symptoms of

7

depression, mania, psychosis, delusions, paranoia, anxiety, obsessions or compulsions. Her mood and affect was noted to be "good" and "mostly bright." (Tr. 397). Dr. McGraw noted that Plaintiff completed an MMPI-2 test and that she "endorsed items in such a manner as to present herself as functioning somewhat worse than she felt," and such "a response pattern is common in situations where a person has secondary gain in others seeing them as ill." Nevertheless, Dr. McGraw found that the test results "can still be interpreted with the caveat that the scores may be an exaggeration of the level of her impairment." (Tr. 397). Test results indicated that Plaintiff is likely to overreact to stressors and appear anxious, attention-seeking and immature. She opined that although Plaintiff relayed a history of bipolar disorder, "there was no evidence of the illness in her recounting her symptoms of the past or in her current presentation." (Tr. 397). Dr. McGraw found "no evidence of mental illness," and opined that Plaintiff's "illness is well controlled with medication." She noted that Plaintiff reported "minimal impairment in daily functioning," and assessed her a GAF score of 70.

Three state agency physicians also reviewed the medical records as they relate to Plaintiff's mental impairments during the relevant time frame. Each of these physicians concluded that Plaintiff's impairments were not severe. (Tr. 230-244, 245-246,

8

290-303).

    2.   Physical Impairments

    In 2003, Plaintiff treated with Michael J. Bradley, D.O.
Plaintiff complained of chronic low back pain and weakness in
both of her thighs.  More than one examination with Dr. Bradley
revealed that Plaintiff had no neurological or muscuskeletal
deficits.  (Tr. 213, 215).  X-rays of Plaintiff's lumbar spine
showed mild osteoarthritis.  (Tr. 182).

    Plaintiff also treated with Stephen F. Penny, M.D., a
neurologist.  Dr. Penny found that Plaintiff had normal muscle
tone and muscle strength, normal sensation, normal coordination,
normal reflexes and routine heel, toe and tandem gaits.  An MRI
of Plaintiff's head showed a possible intracanalicular acoustic
schwannoma.  (Tr. 261-262).

    In August 2003, Plaintiff was evaluated by Eric R. Tamesis,
M.D., a rheumatologist.  Dr. Tamesis found that Plaintiff had no
edema, no nerve deficits, intact motor function and intact
sensation.  (Tr. 193-194).  Plaintiff had no pain on range of
motion testing and her straight-leg testing was normal.  Dr.
Tamesis diagnosed Plaintiff with polyarthralgia, mild
degenerative joint disease and mild left leg weakness.

    Plaintiff also treated with Yakov U. Koyfman, M.D. in
September 2003 for a neurological evaluation of her headaches.
However, Plaintiff reported that her headaches were "under better

                                                            9

control now."   (Tr. 204).   Plaintiff had full range of motion of
her neck, no muscle atrophy and her muscle tone and strength were
preserved in all muscle groups of the upper and lower
extremities.   She was able to tandem walk, tiptoe walk and heel
walk.   She also had normal reflexes and sensations.

Plaintiff treated with Michael T. Teixido, M.D., in October
2003.   Dr. Teixido noted that Plaintiff's ear tumor was benign
and that her hearing was not affected.   Plaintiff also reported
being "pleased" with her current medications for her migraines,
but Dr. Teixido advised her that if breakthrough migraines
occurred there would be other strategies available to control
them.   (Tr. 209).

In November 2003, Plaintiff returned for a follow-up with
Dr. Penny concerning her legs.   An MRI of her lumbar spine was
normal, a sleep study was normal, and x-rays of her hip were
negative.   Plaintiff was to be evaluated for restless leg
syndrome.   By April 2004, Plaintiff reported improvement in her
restless leg syndrome, and an MRI of the lumbar spine was
unremarkable.   (Tr. 248, 250).   Plaintiff returned to Dr. Penny
in December 2004, and reported that her migraines were well
controlled with Topamax until six weeks ago when they began
worsening.   (Tr. 318).   At this visit, Plaintiff had intact
recent and remote memory, normal facial and shoulder strength,
normal upper and lower extremity strength, no sensory deficits

and normal gait.

In May 2005, Dr. Penny signed a statement opining that Plaintiff was unable to sustain full-time regular work and could at most work her 20 hour per week part-time job due to migraine headaches, depression, leg pain and acoustic neuroma. However, Dr. Penny did not describe any specific functional limitations. (Tr. 337-338).

Plaintiff also saw Dr. Koyfman again in May 2005, and he noted that she was neurologically unchanged, although the acoustic neuroma had doubled in size. Dr. Koyfman recommended that she follow up with Dr. Teixido. (Tr. 327).

Dr. Teixido did not believe that the tumor was causing Plaintiff's headaches and noted that her hearing was still normal. He did not want her to pursue surgery. (Tr. 332).

In June 2005, Plaintiff returned to Dr. Tamesis for another rheumatological evaluation. (Tr. 408-409). Plaintiff had no nerve deficits, and normal sensation, reflexes and motor functioning. She had no pain on range of motion testing, but Dr. Tamesis found her history and examination to be most suggestive of fibromyalgia and perhaps a connective tissue disease like early lupus. Dr. Tamesis also signed a statement opining that Plaintiff could not work full-time due to fibromyalgia syndrome, anxiety and depression, but did not describe any functional limitations. (Tr. 345). Her examination was essentially

11

unchanged in January 2006, and Dr. Tamesis recommended that she begin an exercise program. (Tr. 412).

On November 15, 2005, Plaintiff underwent a consultative examination with Kartik Swaminathan, M.D. (Tr. 387-389). Dr. Swaminathan noted that Plaintiff did not use any assistive devices or braces, and did not exhibit any protective posturing or restricted range of motion during gait, during transfers and during various activities. Plaintiff's sensation was within normal limits, and the range of motion in her lumbar and cervical spine were normal; however, minimal myofascial tenderness was noted in the bilaterial trapezius and bilateral greater trochanters suggestive of fibromyalgia. Plaintiff was able to walk on her heels and toes and tandem walk. Dr. Swaminathan noted that Plaintiff did not exhibit any functional limitations during her evaluation. Dr. Swaminathan completed an RFC for Plaintiff finding that she could lift twenty-five pounds occasionally and ten pounds frequently, could stand, walk and sit six hours per day and occasionally perform postural activities. (Tr. 390-391). Dr. Swaminathan noted that Plaintiff should also have limited exposure to dust, vibration, humidity/wetness, hazards, fumes, odors, chemicals and gases. (Tr. 393).

A state agency physician also reviewed the medical evidence relating to Plaintiff's physical impairments. In an assessment dated January 15, 2004, this physician opined that Plaintiff

12

could perform medium work with no concentrated exposure to extreme cold, noise or vibration. (Tr. 221-223). A second physician reviewed the evidence in July 2004, and concluded that Plaintiff could perform light work with occasional climbing of ladders, ropes or scaffolds. (Tr. 275-276).

B.    The A.L.J.'s Decision

On March 1, 2006, the A.L.J. held a hearing in connection with the remand of Plaintiff's claims from the Appeals Council. Plaintiff was represented by counsel at the hearing, and her mother and a vocational expert testified. (Tr. 489-532). Plaintiff testified that she works part-time at a homeless shelter on Thursdays, Fridays and Saturdays for three 8 hour shifts, and sometimes on Tuesdays, Wednesdays and Fridays. She testified that some days "it's like a zoo," and others days she has "no problems at all." (Tr. 495). She testified that she has difficulty working several days in a row, because she has pain and needs time to recuperate. She also testified that she becomes emotionally fatigued, because she watches her children for several days in a row when she's not working.

With regard to other activities, Plaintiff testified that she does a few household chores like washing the dishes and cleaning the bathroom, but that she can't vacuum or sweep. Plaintiff testified that she cross-stitches, watches television, and crochets. She testified that she can stand still with

13

something to lean on for an hour to an hour and a half, but that she has balance problems. She testified that she could maybe lift a laundry basket full of clothes but that she wouldn't be able to carry it far. She testified regarding her medications and that they help her condition sometimes. She also noted that she feels depressed, suffers from lack of motivation, lack of concentration and lack of patience.

The A.L.J. asked the vocational expert questions regarding Plaintiff and her past relevant work. The vocational expert testified that Plaintiff's past work was unskilled or semiskilled work which she performed at the light and sedentary level, depending on the particular position. The A.L.J. asked the vocational expert to consider someone with Plaintiff's history who has the symptoms and limitations that Plaintiff testified to during the hearing. The vocational expert testified that such a person could not perform any full-time jobs. Then he asked the vocational expert to consider an individual with the limitations found by Dr. Swaminathan and Dr. McGraw. The vocational expert testified that such an individual could perform Plaintiff's past relevant work. However, the vocational expert noted, in response to a question from Plaintiff's attorney, that a hypothetical individual with the limitations described by Ms. McKee could not perform any full-time work.

In his decision dated June 7, 2006, the A.L.J. found that

14

Plaintiff's fibromyalgia syndrome and bipolar disorder are severe
impairments, but they do not meet or equal, alone or in
combination, a listed impairment. (Tr. 28-29). With regard to
her migraine headaches, the A.L.J. concluded that her headaches
were not a severe impairment. The A.L.J. found that Plaintiff's
testimony regarding her limitations was not fully credible. The
A.L.J. then evaluated Plaintiff's RFC and concluded that
Plaintiff was capable of performing her past relevant work, which
included work as a residential manager, salesperson, data entry
clerk, security guard and cashier, because this work was semi-
skilled or unskilled and performed at the light exertional level.
Accordingly, the A.L.J. concluded that Plaintiff was not under a
disability within the meaning of the Act.

**STANDARD OF REVIEW**

Pursuant to 42 U.S.C. § 405(g), findings of fact made by the
Commissioner of Social Security are conclusive, if they are
supported by substantial evidence. Accordingly, judicial review
of the Commissioner's decision is limited to determining whether
"substantial evidence" supports the decision. Monsour Medical
Ctr. v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986). In making
this determination, a reviewing court may not undertake a de novo
review of the Commissioner's decision and may not re-weigh the
evidence of record. Id. In other words, even if the reviewing
court would have decided the case differently, the Commissioner's

15

decision must be affirmed if it is supported by substantial evidence. Id. at 1190-91.

The term "substantial evidence" is defined as less than a preponderance of the evidence, but more than a mere scintilla of evidence. As the United States Supreme Court has noted substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 555 (1988).

With regard to the Supreme Court's definition of "substantial evidence," the Court of Appeals for the Third Circuit has further instructed, "A single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores or fails to resolve a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence . . . or if it really constitutes not evidence but mere conclusion." Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983). Thus, the substantial evidence standard embraces a qualitative review of the evidence, and not merely a quantitative approach. Id.; Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981).

## DISCUSSION

## I.   Evaluation Of Disability Claims

Within the meaning of social security law, a "disability" is

16

defined as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death, or which has lasted or can be expected to last, for a continuous period of not less than 12 months. 42 U.S.C. §§ 423(d)(1)(A), 1382(c)(a)(3). To be found disabled, an individual must have a "severe impairment" which precludes the individual from performing previous work or any other "substantial gainful activity which exists in the national economy." 20 C.F.R. §§ 404.1505, 416.905. In order to qualify for disability insurance benefits, the claimant must establish that he or she was disabled prior to the date he or she was last insured. 20 C.F.R. § 404.131, Matullo v. Bowen, 926 F.2d 240, 244 (3d Cir. 1990). The claimant bears the initial burden of proving disability. 20 C.F.R. §§ 404.1512(a), 416.912(a); Podeworthy v. Harris, 745 F.2d 210, 217 (3d Cir. 1984).

In determining whether a person is disabled, the Regulations require the A.L.J. to perform a sequential five-step analysis. 20 C.F.R. §§ 404.1520, 416.920. In step one, the A.L.J. must determine whether the claimant is currently engaged in substantial gainful activity. In step two, the A.L.J. must determine whether the claimant is suffering from a severe impairment. If the claimant fails to show that his or her impairment is severe, he or she is ineligible for benefits.

17

Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999).

If the claimant's impairment is severe, the A.L.J. proceeds to step three. In step three, the A.L.J. must compare the medical evidence of the claimant's impairment with a list of impairments presumed severe enough to preclude any substantial gainful work. Id. at 428. If the claimant's impairment meets or equals a listed impairment, the claimant is considered disabled. If the claimant's impairment does not meet or equal a listed impairment, the A.L.J.'s analysis proceeds to steps four and five. Id.

In step four, the A.L.J. is required to consider whether the claimant retains the residual functional capacity to perform his or her past relevant work. Id. The claimant bears the burden of establishing that he or she cannot return to his or her past relevant work. Id.

In step five, the A.L.J. must consider whether the claimant is capable of performing any other available work in the national economy. At this stage the burden of production shifts to the Commissioner, who must show that the claimant is capable of performing other work if the claimant's disability claim is to be denied. Id. Specifically, the A.L.J. must find that there are other jobs existing in significant numbers in the national economy, which the claimant can perform consistent with the claimant's medical impairments, age, education, past work

experience and residual functional capacity. Id. In making this determination, the A.L.J. must analyze the cumulative effect of all of the claimant's impairments. At this step, the A.L.J. often seeks the assistance of a vocational expert. Id. at 428.

## II. Whether The A.L.J.'s Decision Is Supported By Substantial Evidence

By her Motion, Plaintiff contends that the A.L.J.'s decision is not supported by substantial evidence. Specifically, Plaintiff contends that the A.L.J. erred in (1) evaluating the medical evidence and testimony concerning Plaintiff's fibromyalgia syndrome, and in particular in weighing the opinion of Plaintiff's treating rheumatologist, Dr. Tamesis; (2) disregarding the testimony of Plaintiff's treating psychiatrist regarding her anxiety and depression; and (3) concluding that her migraine headaches were not a severe impairment. The Court will analyze each of Plaintiff's arguments in turn.

### A. Whether The A.L.J. Erred In Evaluating Plaintiff's Fibromyalgia

Plaintiff contends that the A.L.J. erred in evaluating Plaintiff's fibromyalgia. Specifically, Plaintiff contends that the A.L.J. improperly concluded that Plaintiff's fibromyalgia was not severe, improperly evaluated Plaintiff's credibility and subjective complaints concerning the intensity, duration and limiting effect of her symptoms, and improperly rejected the opinion of her treating physician, Dr. Tamesis.

19

Fibromyalgia is considered to be an incurable disease and its causes are unknown. See e.g., Wilson v. Apfel, 1999 WL 993723, *1, n. 1 (E.D. Pa. Oct. 29, 1999) (citing Sarchet v. Chater, 78 F.3d 305, 306 (7th Cir. 1996)). In evaluating claimants with fibromyalgia, courts have recognized that the symptoms of the disease are entirely subjective and that there are no current laboratory tests that can gauge the severity of the condition. Id. However, courts have also recognized that a diagnosis of fibromyalgia does not necessarily equate with a finding of disability under the Act. Id.; see also In re Petition of Sullivan, 904 F.2d 826, 845 (3d Cir. 1990) (recognizing that diagnosis of an impairment is not sufficient to establish disability, but rather functional limitations arising from impairment must be considered). Because of the subjective nature of fibromyalgia, "the credibility of a claimant's testimony regarding her symptoms takes on substantially increased significance in the A.L.J.'s evaluation of the evidence." Brunson v. Barnhart, 2002 WL 393078, *16 (E.D.N.Y. Mar. 14, 2002). In evaluating the claimant's complaints of pain in the context of a diagnosis of fibromyalgia, the A.L.J. may also consider such factors as (1) whether the record contains a detailed clinical documentation of the claimant's symptoms, and (2) whether the physicians who diagnosed the claimant with fibromyalgia reported on the severity of his or her condition.

Id.

Reviewing the A.L.J.'s analysis of Plaintiff's fibromyalgia in the context of the relevant case law, the Court concludes that the A.L.J. did not err in his evaluation. In reaching this conclusion, the Court first notes that, contrary to Plaintiff's argument, the A.L.J. did find that Plaintiff's fibromyalgia was a severe impairment, but that the impairment did not meet or equal a listing. Having made this determination, the A.L.J. was next required to evaluate Plaintiff's RFC.

A claimant's RFC is "that which an individual is still able to do despite the limitations caused by his or her impairment[s]." Fargnoli v. Massanari, 247 F.3d 34, 40 (3d Cir.2001) (citation omitted). When determining an individual's RFC at step four of the sequential evaluation, the A.L.J. must consider all relevant evidence including medical records, observations made during medical examinations, descriptions of limitations by the claimant and others, and observations of the claimant's limitations by others. Id. Before an individual's RFC can be expressed in terms of an exertional level of work, the A.L.J. "must first identify the individual's functional limitations or restrictions and assess his or her work related abilities on a function by function basis." SSR 96-8p. The RFC must also address both the exertional and non-exertional capacities of the individual. Id. Non-exertional capacity

21

refers to "all work-related limitations and restrictions that do not depend on an individual's physical strength," such as limitations which are psychological or mental in nature.  Id.

The A.L.J.'s RFC assessment must "be accompanied by a clear and satisfactory explanation of the basis on which it rests." Fargnoli, 247 F.3d at 41.  In weighing the evidence, the A.L.J. must give some indication of the evidence which he or she rejects and his or her reason for discounting the evidence.  Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 121 (3d Cir. 2000); see also SSR 96-8p.  "In the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored."  Cotter v. Harris, 642 F.2d 700, 705 (3d Cir. 1981).  The responsibility for formulating an RFC rests exclusively with the A.L.J., and the RFC finding is considered an administrative finding and not a medical opinion. SSR 96-50, 1996 WL 374183 (1996).

With respect to his evaluation of Plaintiff's RFC, the A.L.J. concluded that Plaintiff's fibromyalgia and other impairments would limit her to light work with a sit/stand option at will, occasional climbing, balancing, kneeling, crouching, crawling or stooping, and no concentrated exposure to noise, dust, vibration, humidity/wetness and hazards.  The A.L.J. also concluded that Plaintiff's subjective complaints were not entirely credible.  The Court concludes that the A.L.J.'s RFC and

22

credibility determinations are supported by substantial evidence.
The A.L.J. expressly noted that none of Plaintiff's treating
physicians identified any specific functional limitations arising
from her fibromyalgia or other conditions that would render her
totally disabled.  The A.L.J. also correctly found that
Plaintiff's treatment records did not reflect hospitalizations or
other treatment measures that would be indicative of a disabling
condition.  Rather, as the A.L.J. observed, Plaintiff's treatment
records were consistent with "conservative, routine maintenance."
(Tr. 31).  Plaintiff's medical records were also inconsistent
with many of Plaintiff's subjective complaints.  For example,
Plaintiff claims she was totally disabled, yet her treating
physician, Dr. Tamesis encouraged her to exercise.  Plaintiff
also complained of balance difficulties and pain, but treatment
records from Dr. Tamesis and Dr. Penny revealed normal muscle
tone and strength, normal coordination, routine, heel, toe and
tandem gaits, intact motor function and no pain on range of
motion testing.  Moreover, Plaintiff's treatment with Dr. Tamesis
was inconsistent insofar as she treated with him in August 2003,
but did not see him again until June 2005, when she presented
disability forms to him for completion.

      To the extent that Plaintiff contends that the A.L.J. erred
in declining to adopt Dr. Tamesis's opinion that Plaintiff was
unable to work a full-time job, the Court likewise concludes that

23

the A.L.J.'s decision was not erroneous. An A.L.J. may reject the opinion of a treating physician if the opinion is not supported by medically acceptable clinical and laboratory diagnostic techniques and is inconsistent with other substantial evidence in the record. Fargnoli v. Massanari, 247 F.3d 34, 42 (3d Cir.2001). If the A.L.J. rejects the opinion of a treating physician, he or she must adequately explain the reasons for doing so on the record. Mason v. Shalala, 994 F.2d 1058, 1067 (3d Cir. 1993). If a treating physician's opinion is rejected, the A.L.J. must consider such factors as the length of the treatment relationship, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record evidence, any specialization of the opining physician and other factors the plaintiff raises, in determining how to weigh the physician's opinion. 20 C.F.R. § 404.1527(d)(2)-(6).

In this case, Dr. Tamesis completed a pre-printed form prepared by Plaintiff's attorney which indicated that she was unable to work a full-time job or perform more than twenty hours of work per week at her current job. In addition, Dr. Tamesis provided no specific functional limitations precluding Plaintiff from working.[1] The A.L.J. correctly considered these

---

[1] To the extent that Plaintiff directs the Court to evidence presented to the Appeals Council and not to the A.L.J., which includes evidence from Dr. Tamesis, the Court notes that

deficiencies, as well as the gaps in Plaintiff's treatment record

with Dr. Tamesis, in his decision declining to credit Dr.

Tamesis's conclusory assertion that Plaintiff was disabled.

Miller v. Chater, 172 F.3d 303 (3d Cir. 1999); Jones v. Sullivan,

954 F.2d 125, 129 (3d Cir. 1991) (upholding A.L.J.'s decision to

decline to give controlling weight to opinions of treating

physicians that were conclusory). Accordingly, the Court

concludes that the A.L.J. did not err in rejecting Dr. Tamesis's

opinion that Plaintiff was disabled.

In sum, the Court concludes that the A.L.J. provided

adequate explanation for his credibility determinations and

properly analyzed Plaintiff's complaints of fibromyalgia in light

of the record evidence and appropriate legal principles, and

appropriately weighed the opinion of Plaintiff's treating

physician. Accordingly, the Court concludes that the A.L.J. did

not err in evaluating Plaintiff's fibromyalgia, and his

---

this evidence was not before the A.L.J., and therefore, it cannot
be used by the Court in reviewing the A.L.J.'s decision under the
substantial evidence standard. Rather, such evidence may only
form the basis of a remand pursuant to sentence six of 42 U.S.C.
§ 405(g). To establish a remand under sentence six, the
plaintiff must show (1) the evidence is new and not cumulative of
what is already in the record; (2) the evidence is material, that
is relevant and probative, and there is a reasonable probability
that it would have changed the outcome of the Commissioner's
decision; and (3) the plaintiff has demonstrated good cause for
not having incorporated the evidence into the record. Matthews
v. Apfel, 239 F.3d 589, 592 (3d Cir. 2001). Plaintiff has not
made any showing with respect to these elements, and therefore,
the Court finds no basis to allow for a sentence six remand.

conclusions relating to this impairment, including his

credibility evaluation of Plaintiff, are supported by substantial

evidence.

B.    Whether The A.L.J. Erred In Evaluating Plaintiff's
      Depression And Anxiety

With respect to her allegations of anxiety and depression,

Plaintiff contends that the A.L.J. improperly declined to credit

the opinion of her treating psychiatrist, Dr. Villabona, and

instead credited the opinion of a consultative psychologist, Kate

McGraw, who only examined Plaintiff on one occasion. However, as

the A.L.J. noted, Dr. Villabona's opinion regarding Plaintiff's

inability to perform more than twenty hours of work per week was

not entirely consistent with his treatment records of Plaintiff.

Treatment records from Dr. Villabona from October 2002 through

July 2003, indicate that Plaintiff was "functional" on her

medications, and only mildly depressed. Moreover, like the

opinion of Dr. Tamesis, Dr. Villabona opined on a preprinted

form, without specifying functional limitations, that Plaintiff

could not sustain full-time work. Dr. Villabona's opinion was

unsupported by any mental status testing and was primarily based

on Plaintiff's subjective complaints. In contrast, Dr. McGraw's

opinion was consistent with mental health tests she performed, as

well as with the opinion of Dr. Keyes, who performed an initial

consultative evaluation of Plaintiff. Given the lack of

objective or clinical mental status examination findings

26

supporting Dr. Villabona's opinion and its conclusory nature, the Court cannot conclude that the A.L.J. erred in declining to give Dr. Villabona's opinion significant weight, and instead, relying upon the opinion of Dr. McGraw, which was consistent with other evidence in the record.

    C.    Whether The A.L.J. Erred In Assessing The Severity
           Of Plaintiff's Migraine Headaches

An impairment is "not severe" if it does not significantly limit a claimant's physical or mental capacity to perform basic work activities. 20 C.F.R. §§ 404.1521(a), 416.921(a). With regard to physical impairments, basic work activities include such activities as walking, standing, lifting, pushing, pulling, reaching, carrying or handling. A finding of severity under the regulations must be premised solely on a showing that medical factors exist which affect the plaintiff's ability to perform basic work activities. Vocational factors, such as age, education and work experience may not be considered.

Plaintiff contends that the A.L.J. erred in his conclusion that Plaintiff's headaches were not severe because he (1) mistakenly referred to Plaintiff's ear, nose and throat specialist, Dr. Teixido, as a neurologist, (2) failed to note that Plaintiff took Topamax for her headaches and instead referenced only her use of Tylenol and caffeine, and (3) failed to discuss Dr. Penny's treatment of Plaintiff's headaches. With regard to this last point, Plaintiff contends that the A.L.J.

erroneously relied upon Dr. Tamesis's lack of treatment notes
regarding Plaintiff's headaches, when in fact, Plaintiff never
treated with Dr. Tamesis for that condition.

While the Court agrees with Plaintiff that the A.L.J.'s
decision contains the aforementioned errors, the Court concludes
that those errors are harmless, and the A.L.J.'s conclusion that
Plaintiff's headaches were not severe is still supported by
substantial evidence in the record. Although Dr. Teixido is not
a neurologist, the A.L.J. was certainly free to credit his view
that Plaintiff's acoustic neuroma, a condition which Dr. Teixido
was treating, was not causing her headaches. As for Plaintiff's
use of Topamax, the Court notes that Plaintiff did testify at the
hearing that she took Topamax daily, but she also referenced her
use of Tylenol and caffeine to cope with break through headaches.
Treatment records, including Plaintiff's reports to her
physicians, indicate that Topamax controlled her headaches with
the exception of recent breakthrough headaches, which Plaintiff
testified occurred only once a month and could sometimes be
warded off with Tylenol and caffeine. While Dr. Penny, and not
Dr. Tamesis, treated Plaintiff's headaches, the Court notes that
treatment records from Dr. Penny are sporadic. Moreover, none of
Plaintiff's treating physicians specified any functional
limitations arising from Plaintiff's headaches, and instead
opined, in conclusory fashion, that her headaches caused her to

be disabled. In addition, the Court notes that the consultative and state agency physicians accepted Plaintiff's diagnosis of migraine headaches and still opined that she was able to perform a limited range of light work. Because the A.L.J. was not required to accept the conclusory opinions of Plaintiff's treating physicians, and the record demonstrates that Plaintiff's headaches were under control with medication and did not result in any specified functional limitations, the Court concludes that the A.L.J. did not err in concluding that Plaintiff's migraine headaches were not a severe impairment.

D.   Whether The A.L.J. Erred In Assessing Plaintiff's Credibility

Generally, the A.L.J.'s assessment of a plaintiff's credibility is afforded great deference, because the A.L.J. is in the best position to evaluate the demeanor and attitude of the plaintiff. See e.g. Fargnoli v. Massanari, 247 F.3d 34, 43 (3d Cir. 2001); Griffith v. Callahan, 138 F.3d 1150, 1152 (7th Cir. 1998); Wilson v. Apfel, 1999 WL 993723, *3 (E.D. Pa. Oct. 29, 1999). However, the A.L.J. must explain the reasons for his or her credibility determinations. Schonewolf v. Callahan, 972 F. Supp. 277, 286 (D.N.J. 1997) (citations omitted).

In his decision, the A.L.J. concluded that Plaintiff had medically determinable impairments that could reasonably be expected to produce the symptoms she alleged, but that her statements concerning the intensity, duration, and limiting

29

effects of those symptoms were not entirely credible.  In reaching this conclusion, the A.L.J. considered both Plaintiff's testimony regarding her daily activities of living, as well as her medical records.  As explained in the context of discussing Plaintiff's fibromyalgia, the A.L.J. adequately explained his reasons for declining to fully credit Plaintiff's testimony, and therefore, the Court cannot conclude that the A.L.J.'s assessment of Plaintiff's credibility was erroneous.

## CONCLUSION

For the reasons discussed, the Court will grant Defendant's Motion For Summary Judgment and deny Plaintiff's Motion For Summary Judgment.  The decision of the Commissioner dated June 7, 2006, will be affirmed.

An appropriate Order will be entered.